UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| HASAN AHMED TALEB AL-THURAYA,<br><br>                              Petitioner,<br><br>-against-<br><br>WARDEN, Orange County Correctional<br>Facility et al.,<br><br>                              Respondents. | 25-cv-2582 (AS)<br><br>OPINION AND ORDER |

ARUN SUBRAMANIAN, United States District Judge:

Petitioner Hasan Al-Thuraya has been held in immigration detention for over eleven months. He was ordered removed to his home country of Yemen, and he is challenging that determination before the Second Circuit, which has stayed his removal. He seeks release, or at the very least a bond hearing, pending the completion of his case. On September 22, 2025, the Court ordered the Government to furnish Al-Thuraya for a bond hearing before an immigration judge (IJ) in accordance with the procedures described in *Black v. Decker*, 103 F.4th 133 (2d Cir. 2024). The Court noted that an opinion with its reasons for the order, as well as addressing the remaining claims in Al-Thuraya's petition, would issue shortly. For the following reasons, Al-Thuraya's petition is GRANTED IN PART and DENIED IN PART.

## BACKGROUND

In 2021, Al-Thuraya, without authorization, crossed the border from Mexico into the United States. He surrendered to authorities ten minutes later and sought asylum based on a fear of persecution in Yemen. He was then placed into expedited removal proceedings and detained. *See* 8 U.S.C. § 1225(b)(1). Because Al-Thuraya sought asylum relief, an immigration officer interviewed him shortly after he was taken into custody. The officer found that he had a credible fear of persecution.

Al-Thuraya was then placed in full-fledged (rather than expedited) removal proceedings, allowing him the opportunity to pursue his asylum claim. This process involves multiple stages of review, including an evidentiary hearing before an IJ, review of the IJ's decision by the Board of Immigration Appeals (BIA), and review in a federal court of appeals. *See DHS v. Thuraissigiam*, 591 U.S. 103, 108 (2020).

While that process was ongoing, the Government granted Al-Thuraya parole from detention. He then lived freely in the community, seemingly without incident. However, the Government revoked Al-Thuraya's release in 2024. The Government says that Al-Thuraya's parole automatically terminated in August 2022, Dkt. 38, and while it didn't pick him up then, it revoked his release in 2024 because Al-Thuraya was flagged as a potential threat to national security, as someone who is suspected of engaging in terrorism or espionage, Dkt. 27-1 at ¶ 4. On November

5, 2024, Immigration and Customs Enforcement (ICE) arrested Al-Thuraya and took him back into custody.

Earlier this year, an IJ denied Al-Thuraya's application for asylum and related relief. The BIA affirmed the IJ's decision. Al-Thuraya has sought review of the BIA's decision before the Second Circuit. On July 16, 2025, the Second Circuit stayed Al-Thuraya's removal in a short-form order, citing *Nken v. Holder*, 556 U.S. 418, 434 (2009), for the proposition that "likelihood of success on the merits and irreparable harm absent a stay are the 'most critical' factors." Dkt. 25-1. His petition for review remains pending.

**DISCUSSION**

### I.  Al-Thuraya's demands for mandamus and *Zadvydas* relief are denied.

Al-Thuraya's petition initially sought mandamus relief based on a then-pending application for temporary protected status ("TPS"); and a claim for release under *Zadvydas v. Davis*, 533 U.S. 678 (2001), on the grounds that his removal to Yemen is infeasible given the conditions in that country.

However, while this petition was pending, Al-Thuraya's TPS application was denied, rendering the mandamus claim moot. As for *Zadvydas*, while its due-process teachings are relevant here, it was a statutory-interpretation case dealing with a different statute, 8 U.S.C. § 1231(a)(6). That statute applies to noncitizens who have final removal orders in place, but who cannot be removed. 533 U.S. at 682. Al-Thuraya isn't in that position yet, given that he still is challenging his removal. And the Government claims that if Al-Thuraya's removal order is rendered final, he can and will be sent to Yemen.

So Al-Thuraya's only live claim is his due-process challenge to his detention "without a judicial custody determination." Dkt. 1 ¶¶ 49–53. The Court construes that as a claim seeking a bond hearing before an IJ consistent with the Second Circuit's decision in *Black v. Decker*, discussed more in this opinion.

### II.  Is Al-Thuraya due *any* process?

Al-Thuraya doesn't dispute that his current detention is governed by 8 U.S.C. § 1225(b)(1)(B)(ii), which states that if an immigration officer finds a credible fear of persecution, an "alien *shall be detained* for further consideration of the application for asylum." (Emphasis added.) Detention is mandatory under this statute, and Al-Thuraya presents no *statutory* basis for his release. *See Jennings v. Rodriguez*, 583 U.S. 281, 299 (2018) (§ 1225(b) "mandates detention of aliens throughout the completion of applicable proceedings").

However, in *Black v. Decker*, 103 F.4th 133 (2d Cir. 2024), the Second Circuit addressed whether a noncitizen subject to mandatory detention may nevertheless have a constitutional due-process right to a bond hearing when their detention becomes unreasonably prolonged. The provision at issue in *Black* was 8 U.S.C. § 1226(c), which states that the Attorney General "shall take into custody" noncitizens charged with removability based on a prior conviction on specified criminal grounds or on allegations of involvement with terrorism. As the Court observed in *Black*, the statute "makes no explicit provision for an initial or other bond hearing during the period of detention and places no limit on the duration of detention under its authority." 103 F.4th at 137;

*see id.* at 142 (observing that "section 1226's text cannot be construed to require a bond hearing after any particular fixed period of detention").

Nevertheless, the Court concluded that "[i]n light of the constitutional concerns identified by the Supreme Court and this Court in connection with the Executive's detention of noncitizens . . . due process bars the Executive from detaining such individuals for an unreasonably prolonged period under section 1226(c) without a bond hearing." *Id*. at 143. The Court rejected "a bright-line constitutional rule requiring a bond hearing after six months of detention—or after any fixed period of detention," but it cautioned "that any immigration detention exceeding six months without a bond hearing raises serious due process concerns." *Id*. at 150.

In determining whether a bond hearing is warranted, *Black* instructed district courts to evaluate the factors set forth in *Mathews v. Eldridge*, 424 U.S. 319 (1976): (1) "the private interest that will be affected by the official action"; (2) "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards"; and (3) "the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Id*. at 151 (quoting *Mathews*, 424 U.S. at 335).

The Court then applied the *Mathews* factors to the two petitioners in that case: Carol Black, who had been detained for seven months, and Keisy G.M., who had been detained for twenty-one months. *Id*. at 137. The Court concluded that both were entitled to a hearing. As to the specifics of the hearing, the Court held that due process required the Government to demonstrate to an IJ "by clear and convincing evidence, the need for [the noncitizen's] continued detention," (that is, either danger to the community or risk of flight) and that the IJ must "consider [the noncitizen's] ability to pay and alternative means of assuring his appearance." *Id*. at 159.

The question in this case is whether the same due-process analysis is warranted for someone like Al-Thuraya, who is detained under §1225(b). The Government says no. It draws a distinction between noncitizens like those in *Black,* who have lived in the country and later are charged with removability, and those like Al-Thuraya, who are stopped at or near the border and are deemed applicants for admission into the United States. Dkt. 12 at 6 ("[T]he Supreme Court has long made clear that applicants for admissions' constitutional due process rights extend only so far as the procedures Congress affords them—and neither § 1225(b) nor any other relevant provisions render applicants for admission eligible for bond hearings."). In short, the Government argues that applicants for entry like Al-Thuraya have *no* constitutional due-process rights.

But the Fifth Amendment provides that, "No *person* shall be . . . be deprived of life, liberty, or property, without due process of law." U.S. Cont. amend. V (emphasis added). The text of the Fifth Amendment applies to all persons—it makes no distinction based on citizenship status or otherwise. *See Mathews v. Diaz*, 426 U.S. 67, 77 (1976) ("There are literally millions of aliens within the jurisdiction of the United States. The Fifth Amendment, as well as the Fourteenth Amendment, protects every one of these persons from deprivation of life, liberty, or property without due process of law."); *see also Wong Wing v. United States*, 163 U.S. 228, 238 (1896) ("[A]ll persons within the territory of the United States are entitled to the protection guarant[e]ed by [the Fifth Amendment], and . . . even aliens shall not be . . . deprived of life, liberty, or property without due process of law.").

Against the general rule that due process applies to all persons, courts have recognized an exception known as the "entry fiction." Under the entry fiction, an applicant for admission to the country is treated as if he were stopped at the border for the purposes of his application for

admission. *See Nishimura Ekiu v. United States*, 142 U.S. 651, 661 (1892). In other words, while a person seeking legal entry into the United States may be granted *physical* entry into the country pending the determination of his application for admission, the mere fact of his physical presence within our borders provides him no greater constitutional protection *as to his application* than if he were outside the country. *See Leng May Ma v. Barber*, 357 U.S. 185, 188 (1958); *see also United States ex rel. Kordic v. Esperdy*, 386 F.2d 232, 235 (2d Cir. 1967). This narrowly-tailored legal fiction exists to accommodate the political branches' broad prerogative to exclude. *See Thuraissigiam*, 591 U.S. at 139 ("[T]he Constitution gives the political department of the government plenary authority to decide which aliens to admit, and a concomitant of that power is the power to set the procedures to be followed in determining whether an alien should be admitted." (cleaned up)). Applicants for admission must look to Congress and the Executive Branch for the procedures determining their legal admission into the country; the Due Process Clause provides no independent font of necessary procedure. But these cases don't suggest that applicants for entry are deprived of all protections of the Constitution. *Cf.* Henry M. Hart, Jr., *The Power of Congress to Limit the Jurisdiction of Federal Courts: An Exercise in Dialectic*, 66 HARV. L. REV. 1362, 1393 (1953) ("What process is due always depends upon the circumstances, and the Due Process Clause is always flexible enough to take the circumstances into account.").

For instance, in *Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206, 212 (1953), Mezei was ordered excluded from the country (on national security grounds) and was detained solely because no other country would take him. Mezei had been conclusively "denied entry"—he had exhausted all avenues of review. *Id*. at 212. In that context, the Supreme Court said that "[w]hatever the procedure authorized by Congress is, it is due process as far as an alien denied entry is concerned." *Id*. The Court focused on the fact that a release from detention would undermine the Government's determination to exclude Mezei. *Id*. at 216 ("Ordinarily to admit an alien barred from entry on security grounds nullifies the very purpose of the exclusion proceeding.").[1]

Similarly, in *Thuraissigiam*, the Court rejected an arriving noncitizen's claim for review of the agency's removal decision, which was based on an asylum officer's finding that he lacked a credible fear of persecution. In that context, the Court stated that "an alien in respondent's position has only those rights *regarding admission* that Congress has provided by statute." 591 U.S. at 140. (emphasis added).

Al-Thuraya stands in a different position. Unlike Mezei and Thuraissigiam, Al-Thuraya has not been definitively "denied entry." Al-Thuraya was initially found by an immigration officer to have a credible fear of persecution; although the agency has denied him relief on his full-fledged asylum petition, he timely sought relief before the Second Circuit, which has stayed his removal; and if the Second Circuit rules in his favor, he may be afforded relief and permitted to stay in this country. The Government lacks the authority to remove Al-Thuraya until all of that gets hashed

---

[1] The Second Circuit in *Guzman v. Tippy*, 130 F.3d 64 (2d Cir. 1997), reached the same conclusion. Just as in *Mezei*, Guzman had been "ordered excluded" after being paroled and committing murder, and he was detained after that decision when his home country Cuba refused to admit him. *Id.* at 65. The Court relied on *Mezei*'s finding that "continued detention of *an excluded* alien" was constitutional, *id*. (emphasis added), in stating that "[a]n excluded alien's rights are determined by the procedures established by Congress and not by the due process protections of the Fifth Amendment," *id*. at 66. Again, just as in *Mezei*, releasing Guzman from detention would have undermined the Government's decision to order him excluded.

out. In other words, Al-Thuraya has neither been admitted (*i.e.*, granted asylum) nor excluded (*i.e.*, denied asylum, given the pendency of his petition for review). So the concern animating the entry fiction exception—that is, the political branches' authority to legally admit or exclude noncitizens—doesn't apply here.[2] Indeed, the due-process claim Al-Thuraya advances doesn't concern his application at all, just the legality of his detention while that application is being reviewed by the Second Circuit.

Unlike Mezei, Al-Thuraya isn't attempting to work around a final order of removal where no other country will take him. And unlike Thuraissigiam, Al-Thuraya isn't seeking any rights "regarding admission," so the Court isn't second-guessing, either directly or indirectly, Congress' and the Executive Branch's decisions or procedures regarding "which aliens to admit." *See Thuraissigiam*, 591 U.S. at 139–40. Because the entry-fiction exception is inapplicable in the context of Al-Thuraya's request for a bond hearing, what's left is the general rule: "[A]ll persons, aliens and citizens alike, are protected by the Due Process Clause." *Mathews v. Diaz*, 426 U.S. at 78; *see also Leng May Ma*, 357 U.S. at 190 ("Physical detention of aliens is now the exception, not the rule."); *United States v. Salerno*, 481 U.S. 739, 755 (1987) ("In our society liberty is the norm, and detention . . . is the carefully limited exception."). Like the noncitizens in *Black*, Al-Thuraya simply asks for a bond hearing based on the duration of his detention. That puts his request in the dead center of the Fifth Amendment's protections. *See Zadvydas*, 533 U.S. at 690 ("Freedom from imprisonment—from government custody, detention, or other forms of physical restraint—lies at the heart of the liberty that Clause protects.").

None of the Government's cases stands for the proposition that applicants for entry in Al-Thuraya's shoes lack the rights afforded to other detained noncitizens as recognized in *Black*. Just like felons subject to removal under § 1226(c), the only permissible purpose for the detention of individuals under § 1225(b)(1)(B)(ii) is to prevent against danger to the community or the risk of flight, which is precisely what a bond hearing would address. What's not at issue is any review of the agency's determination that Al-Thuraya is inadmissible or removable; that's for the Second Circuit—and if it remands, the agency—to decide.

Perhaps for this reason, it's unsurprising that the vast majority of courts to address whether individuals detained under § 1225(b) have a right to a bond hearing have held that they do. *See, e.g.*, *Kydyrali v. Wolf,* 499 F. Supp. 3d 768, 772 (S.D. Cal. 2020); *Mbalivoto v. Holt*, 527 F. Supp. 3d 838, 848 (E.D. Va. 2020); *Leke v. Hott*, 521 F. Supp. 3d 597, 603–04 (E.D. Va. 2021); *Hong v. Mayorkas*, 2022 WL 1078627, at *7 (W.D. Wash. 2022); *Padilla v. U.S. Immigr. & Customs Enf't*, 704 F. Supp. 3d 1163, 1170–72 (W.D. Wash. 2023); *Arechiga v. Archambeault*, 2023 WL 5207589, at *3 (D. Nev. 2023); *A.L. v. Oddo*, 761 F. Supp. 3d 822, 825–26 (W.D. Pa. 2025); *Abreu v. Crawford*, 2025 WL 51475, at *4, *7 (E.D. Va. Jan. 8, 2025); *Rahman v. Garland*, 2025 WL 1920341, at *3, *6 (W.D. Wash. June 26, 2025), *report and recommendation adopted sub nom. Anisur R. v. Garland*, 2025 WL 1919252 (W.D. Wash. July 11, 2025); *Akhmadjanov v. Oddo*, 2025 WL 660663, at *4 (W.D. Pa. Feb. 28, 2025); *A.E. v. Andrews*, 2025 WL 1424382, at *3 (E.D. Cal. May 16, 2025), *report and recommendation adopted*, 2025 WL 1808676 (E.D. Cal. July 1,

---

[2] One might wonder why the "entry fiction" even comes into the picture given Al-Thuraya's parole into the United States in 2021. The answer is that parole does not effect an entry for an individual stopped at or near the border. *See Leng May Ma*, 357 U.S. at 190. Nor does it matter that Al-Thuraya made it across the border and then surrendered to authorities, as opposed to presenting himself to authorities at the border. *See Thuraissigiam*, 591 U.S. at 139.

2025); *Rodrigues De Oliveira v. Joyce*, 2025 WL 1826118, at *6 (D. Me. July 2, 2025); *Singh v. Andrews*, 2025 WL 1918679, at *6 (E.D. Cal. July 11, 2025); *Abdul-Samed v. Warden*, 2025 WL 2099343, at *6 (E.D. Cal. July 25, 2025); *Bermudez Paiz v. Decker*, 2018 WL 6928794, at *12 (S.D.N.Y. 2018); *Traore v. Decker*, 2019 WL 3890227, at *3 (S.D.N.Y. 2019); *Birch v. Decker*, 2018 WL 794618, at *6 (S.D.N.Y. 2018); *Destine v. Doll*, 2018 WL 3584695, at *4–*5 (M.D. Pa. 2018); *Otis V. v. Green*, 2018 WL 3302997, at *6–*8 (D.N.J. 2018); *Perez v. Decker*, 2018 WL 3991497, at *3–*4 (S.D.N.Y. 2018).

In this district, the Government cites two cases pointing in the opposite direction, *Poonjani v. Shanahan*, 319 F. Supp. 3d 644 (S.D.N.Y. 2018), and *Mendez Ramirez v. Decker*, 612 F. Supp. 3d 200 (S.D.N.Y. 2020). *Poonjani* and *Mendez Ramirez* relied on *Mezei*, but both elided the crucial differences between applicants for interim relief under § 1225(b)(1)(B)(ii) like Al-Thuraya, and individuals conclusively denied entry like Mezei. As the Court explained above, the former, as opposed to the latter, have not been definitively denied entry to the country, have pending claims to stay here, and are not seeking review—directly or indirectly—of any decision to exclude them. Those differences go to the heart of the Supreme Court's due-process holdings. Under the constitutional interpretation adopted by *Poonjani* and *Mendez Ramirez*, "the Government could permanently detain arriving aliens at detention facilities on the mainland under the fiction that such persons were not 'in' the United States, no matter how long, arbitrary, or capricious such detention. What's more, that wide-sweeping authority would not be grounded in the Constitution itself (which broadly provides that 'no person shall . . . be deprived of life, liberty, or property, without due process of law'), but rather the INA's administrative definition of 'admission.'" *Birch*, 2018 WL 794618, at *6. Neither the Supreme Court, the Second Circuit, nor as far as the Court can tell, any circuit court, has endorsed this outcome based on *Mezei*.

### III.    What process is Al-Thuraya due?

For those reasons, the Court holds that the due-process framework recognized by the Second Circuit in *Black* applies to Al-Thuraya. So the question of what kind of process Al-Thuraya is due turns on the application of the *Mathews* factors, which the parties addressed in supplemental briefs. *See* Dkts. 35, 36.

At the first step of the *Mathews* test, the Court looks to the "the private interest that will be affected by the official action." 424 U.S. at 335. Here, as in *Black*, "the private interest affected by the official action is the most significant liberty interest there is—the interest in being free from imprisonment." 103 F.4th at 151 (citation omitted). And Al-Thuraya has been in detention for over eleven months—so any incursion on his liberty interest is serious. *See Black*, 103 F.4th at 151 (describing seven-month detention as "serious[]"). The Government claims that Al-Thuraya lacks any constitutionally cognizable liberty interest, *see* Dkt. 36 at 2, but as the Court has explained, that isn't true. The first step of the *Mathews* test goes Al-Thuraya's way.

Next the Court looks to "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards." *Mathews*, 424 U.S. at 335. Under § 1225(b)(1)(B)(ii), there are no "procedural safeguards" in place to determine whether Al-Thuraya's detention has become unreasonable. The Government acknowledges that Al-Thuraya's only option to contest the length of his detention is to seek discretionary parole. *See* Dkt. 36 at 3 (citing 8 U.S.C. § 1182(d)(5)(A)). That means *any* additional safeguard against unreasonable detention will be valuable. *See Black*, 103 F.4th at 153 ("In the absence of any meaningful initial procedural safeguards, it appears to us that almost *any* additional

procedural safeguards at some point in the detention would add value. The most obvious of these—and that sought by [Al-Thuraya]—would be an individualized bond hearing at which an IJ can consider the noncitizen's dangerousness and risk of flight."). So the second *Mathews* factor also goes Al-Thuraya's way.

Finally, the Court considers "the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Mathews*, 424 U.S. at 335. The Government first asserts that it has a "weighty interest" in "controlling entry and admission of aliens into the United States." Dkt. 36 at 3. The Court agrees, but a bond hearing doesn't impact the Government's determination of whether Al-Thuraya is admissible or not. Instead, it's the kind of routine administrative hearing that comes up in most cases involving detained noncitizens. Next, the Government says that Al-Thuraya's "removal proceedings have already run their course and his applications for relief have all been denied." *See id.* But this view of things overlooks the Second Circuit's review of the BIA's decision, one in which that Court stayed Al-Thuraya's removal, citing the likelihood-of-success standard for such relief. Finally, to the extent that the Government thinks that Al-Thuraya poses a danger to the community or to national security, *see id.*, it can raise those concerns before the IJ. That is, the Court takes no position on whether Al-Thuraya should be released or not. The question here is just whether Al-Thuraya should get a hearing after being held in detention for eleven months. *See also Hamdi v. Rumsfeld*, 542 U.S. 507, 530 (2004) ("[C]ommitment for *any* purpose constitutes a significant deprivation of liberty that requires due process protection." (citation omitted)). And so the third *Mathews* factor goes Al-Thuraya's way, too.

All three *Mathews* factors favor granting Al-Thuraya a bond hearing. On the specifics of this hearing, the Court noted above that, in *Black*, the Government bore the burden of justifying Black's continued detention by clear and convincing evidence. 103 F.4th at 157. *Black* also held that the IJ was required to consider alternatives to detention and Black's ability to pay in setting a bond amount. *Id.* at 158.

Circumstances justify applying the same requirements to the bond hearing the Government should provide Al-Thuraya. As the *Black* Court explained, "Requiring that detainees . . . prove that they are *not* a danger and *not* a flight risk . . . presents too great a risk of an erroneous deprivation of liberty after a detention that has already been unreasonably prolonged." *Id.* at 156; *see also Darko v. Sessions*, 342 F. Supp. 3d 429, 435 (S.D.N.Y. 2018) (noting "a consensus view that where, as here, the government seeks to detain an alien pending removal proceedings, it bears the burden of proving that such detention is justified"). And the evidentiary standard of "clear and convincing evidence" is what the Supreme Court "has consistently used . . . for continued detention." *Black*, 103 F.4th at 157. As to the IJ's consideration of alternatives to detention and Al-Thuraya's ability to pay, "refusing to consider ability to pay and alternative means of assuring appearance creates a serious risk that the noncitizen will erroneously be deprived of the right to liberty purely for financial reasons." *Id.* at 158. And the IJ's "choice . . . is not between imprisonment and the alien 'living at large.' It is between imprisonment and supervision under release conditions that may not be violated," *Zadvydas*, 533 U.S. at 696.

## CONCLUSION

For the reasons stated above, and given the length of Al-Thuraya's detention, his petition is GRANTED in part and DENIED in part. Consistent with the Court's September 22, 2025 order, Al-Thuraya is entitled to a bond hearing that follows the procedures described by the Second Circuit in *Black v. Decker*, 103 F.4th 133 (2d Cir. 2024).

SO ORDERED.

Dated: October 9, 2025
New York, New York

ARUN SUBRAMANIAN
United States District Judge